# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

Nat Gaffet, on behalf of himself and all others similarly situated,

*Plaintiff,*

v.

TECUMSEH PRODUCTS COMPANY;
TECUMSEH COMPRESSOR COMPANY;
TECUMSEH DO BRASIL, LTDA.;
TECUMSEH DO BRASIL USA, LLC;
DANFOSS A/S; DANFOSS, INC.; DANFOSS
COMMERCIAL COMPRESSORS, LTD.;
DANFOSS SCROLL TECHNOLOGIES,
LLC; DANFOSS TURBOCOR
COMPRESSORS, INC.; DANFOSS
COMPRESSOR, LLC; WHIRLPOOL
CORPORATION; WHIRLPOOL, S.A.;
EMBRACO NORTH AMERICA, INC.;
PANASONIC CORPORATION;
PANASONIC CORPORATION OF NORTH
AMERICA; APPLIANCES COMPONENTS
COMPANIES, SpA; ACC USA, LLC;
EMERSON CLIMATE TECHNOLOGIES,
INC.; COPELAND CORPORATION, LLC;
CR COMPRESSORS LLC; SCROLL
COMPRESSORS, LLC

*Defendants.*

**CA10- 443M**

C.A. No. _____

## CLASS ACTION COMPLAINT

This action arises from an unlawful agreement to fix the price of hermetic compressors. The Tecumseh Defendants have admitted participation in the conspiracy alleged herein, and have sought conditional amnesty from the United States Department of Justice ("DOJ") in return for cooperation in its investigation. Defendants Embraco North America Inc. (a subsidiary of Defendant Whirlpool) and Defendant Panasonic Corporation have pled guilty to criminal

violations of federal antitrust law in connection with the conspiracy alleged herein. Plaintiff, through his undersigned attorneys, individually and on behalf of all other end-payor purchasers similarly situated in the State of Rhode Island, thus brings this class action for damages and restitution pursuant to the law of Rhode Island against Defendants, and demands a trial by jury.

## NATURE OF THE CASE

1.     This case arises from a long-running, world-wide conspiracy among the Defendants named herein and various unnamed co-conspirators to fix, raise, maintain, and/or stabilize the prices of, and to allocate customers and markets for, Hermetic Compressors (as defined below), thus artificially raising the prices for Hermetic Compressors and products containing Hermetic Compressors sold in Rhode Island between at least January 1, 1996 and December 31, 2009 (the "Class Period"). For ease of reference, both Hermetic Compressors manufactured by one or more Defendants and products containing such compressors (for example, refrigerators) are referred to collectively as "Hermetic Compressor Products."

2.     Substantial evidence shows that the alleged conspiracy was effective and that end-payor purchasers of Hermetic Compressors Products in Rhode Island were among the conspiracy's many victims.

3.     In general, Hermetic Compressors are devices used to produce the "cooling" effect for a variety of refrigeration products, including, but not limited to, refrigerators, freezers, water coolers, and vending machines. The Hermetic Compressor is the critical engine in refrigeration products.

4.     Hermetic Compressor Products, for example refrigerators, typically are used for personal, family or household purposes. Indeed, there are few families in Rhode Island that do not possess a refrigerator and use it for family or household purposes.

2

5. Defendants sold Hermetic Compressors through a number of channels, including in the refrigerator and freezer channel (the "R&F" channel or "R&F Market"), which is dominated by a few large Original Equipment Manufacturers ("OEMs"), including Electrolux and General Electric.

6. Sales of Hermetic Compressors in the R&F channel involve a yearly bidding process by which the OEMs invite Defendants to compete for each OEM's yearly compressor needs. The OEMs invite all the manufacturers of Hermetic Compressors to participate in the bidding at a location and time of the OEMs' choosing. This bidding process is critical for buyers and sellers alike as the prices at which Hermetic Compressors are sold to the OEMs for the entire year are determined in the course of a few days. All of the Defendants actively participated in these meetings.

7. Defendants, however, created a sham bidding system, secretly meeting before the annual contract negotiations, sharing bids with one another, and agreeing upon prices. In addition, Defendants allocated among each other respective shares of the OEM market. Unbeknownst to the OEM's, their annual meetings had become an elaborate farce, with themselves in a starring role.

8. As a result of Defendants' scheme, the price of Compressors between 1996 and 2009 was artificially inflated. This overcharge was then passed on to end-payors in the form of inflated prices for Hermetic Compressors Products.

9. In February 2009, as part of a coordinated international investigation into price fixing and customer and market allocation in the multi-billion dollar Hermetic Compressors industry, antitrust authorities in the United States, the European Union, and Brazil announced that they had raided several businesses run by Defendants.

10.     The DOJ's Antitrust Division has issued grand jury subpoenas to Defendants Tecumseh Products Company and Whirlpool Corporation, and is investigating several U.S.-based Danfoss Defendants (as defined below) as well as Defendant Panasonic Corporation of North America.   Panasonic and Embraco (a division of Whirlpool) recently pled guilty to criminal violations of federal antitrust law.   Defendant Tecumseh has entered into cooperation agreements with authorities in the U.S. and elsewhere, pursuant to which it has admitted the existence of the conspiracy and its role in the conspiracy.

11.     According to information released by Brazilian antitrust regulators, the alleged conspiracy to fix prices of Hermetic Compressors in the R&F Market lasted 12 years and involved agreements to allocate markets and customers, and exchanges of commercially sensitive information related to Hermetic Compressors, including pricing information. Defendants' executives carried out the conspiracy through in-person meetings in hotels, restaurants, and other locations, and by telephone and e-mail.

12.     As a result of the conspiracy, prices for Hermetic Compressor Products were artificially fixed, raised, or maintained at supracompetitive levels.   Indeed, the Brazilian press has reported that in 2008 alone, the conspiracy may have caused losses of approximately BRL 125 million ($425 million).   Defendant Embraco recently agreed to pay approximately $57 million to the Brazilian Justice of Ministry's antitrust division for its participation in this unlawful cartel; Defendant Panasonic has agreed to pay a $49.1 million fine in the United States; and Defendant Embraco North America has agreed to pay a $91.8 million fine in the United States.

13.     Seeking recovery for the financial harm that the conspiracy inflicted on the consuming public in Rhode Island, Plaintiff brings this action on behalf of himself and all those

similarly situated who purchased Hermetic Compressor Products as end payors from Defendants in Rhode Island during the Class Period.

**JURISDICTION AND VENUE**

14.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because during the Class Period certain Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in this District.

16.     Defendants' conspiracy to fix the prices of Hermetic Compressors substantially affected commerce throughout the United States, and in Rhode Island, because Defendants directly, or through their agents, engaged in activities affecting Rhode Island. Defendants have purposefully availed themselves of the laws of the Rhode Island in connection with their activities relating to the production, marketing, sale, and/or distribution of Hermetic Compressors. Defendants produced, promoted, sold, marketed, and/or distributed Hermetic Compressors in Rhode Island, thereby purposefully profiting from access to end-payor purchasers in Rhode Island. As a result of the activities described herein, Defendants:

    a.    Caused damage to the residents of Rhode Island;

    b.    Caused damage in Rhode Island by acts or omissions committed outside Rhode Island;

5

c. Engaged in a persistent course of conduct within each state and/or derived substantial revenue from the marketing and sale of Hermetic Compressors in Rhode Island; and

d. Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in Rhode Island while regularly doing or soliciting business in Rhode Island, engaging in other persistent courses of conduct in Rhode Island and/or deriving substantial revenue from the marketing and sale of Hermetic Compressors in Rhode Island.

17.     The conspiracy described herein adversely affected persons nationwide, and more particularly, consumers in Rhode Island, who purchased Defendants' Hermetic Compressor Products as end-payors for household purposes. Defendants' conspiracy has resulted in an adverse monetary effect on end-payor purchasers in Rhode Island.

18.     Prices of Hermetic Compressor Products in Rhode Island were raised to supra-competitive levels by the Defendants and their co-conspirators. Defendants knew that commerce in Hermetic Compressor Products in Rhode Island would be adversely affected by implementing their conspiracy.

## PARTIES

### Plaintiff

19.     Plaintiff Nat Gaffet is a resident of Block Island, Rhode Island. During the Class Period, defined below, Plaintiff Gaffet bought a Kelvinator refrigerator containing an Embraco hermetic compressor for his own personal, household, and family purposes.

20. As a result of the conspiracy alleged herein, Plaintiff Gaffet, like the members of the class he seeks to represent, suffered pecuniary injury because he paid more for the refrigerator he purchased than he would have absent the conspiracy.

## Defendants

### The Tecumseh Entities

21. Defendant Tecumseh Products Company ("Tecumseh") is a Michigan corporation headquartered in Ann Arbor, Michigan. Tecumseh is a full-line, global manufacturer of Hermetic Compressors. Tecumseh is one of the largest sellers of Hermetic Compressors in the U.S. market, and is also one of the largest global producers of Hermetic Compressors. Tecumseh maintains production and sales operations in North and South America, Europe and Asia. Tecumseh alone possesses a substantial portion of the U.S. compressor market. During the Class Period, Tecumseh, directly and/or through its wholly-owned domestic and foreign subsidiaries, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

22. Defendant Tecumseh Compressor Company ("Tecumseh Compressor") is a Delaware corporation headquartered in Tecumseh, Michigan. Tecumseh Compressor is a wholly-owned subsidiary of Tecumseh. During the Class Period, Tecumseh Compressor, directly and/or through its parent company Tecumseh and Tecumseh's other wholly-owned subsidiaries, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

23. Defendant Tecumseh do Brasil, Ltda. ("Tecumseh Brasil") is a Brazilian corporation headquartered in Sao Carlos, Brazil and is a wholly-owned subsidiary of Tecumseh. Tecumseh Brasil is one of the world's largest manufacturers of Hermetic Compressors.

Tecumseh Brasil operates two manufacturing facilities in Brazil with a combined annual compressor capacity of 17 million units. Tecumseh Brasil is the largest source of Hermetic Compressors sold by Tecumseh and its subsidiaries. Hermetic Compressors produced at Tecumseh Brasil's facilities are shipped and sold throughout the world, including the United States. During the Class Period, Tecumseh Brasil, directly and/or through its parent Tecumseh, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

24.    Defendant Tecumseh do Brasil USA, LLC ("Tecumseh Brasil USA") is a Delaware limited-liability company headquartered in Clinton, Michigan. Tecumseh Brasil USA is a wholly-owned subsidiary of Tecumseh Brasil. Tecumseh Brasil USA, directly and/or through its parent companies Tecumseh and Tecumseh Brasil, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold during the Class Period throughout the United States, including Rhode Island.

### The Whirlpool Entities

25.    Defendant Whirlpool Corporation ("Whirlpool") is a Delaware corporation headquartered in Benton Harbor, Michigan. Whirlpool is a large producer and seller of finished household appliances containing Hermetic Compressors sold under its Whirlpool, Maytag, Jenn-Air, KitchenAid, Amana, Brastemp, Consul, and Bauknecht brand names. During the Class Period, Whirlpool, directly and/or through its wholly-owned subsidiary Defendant Whirlpool S.A., manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

26.    Defendant Whirlpool S.A. ("Whirlpool S.A." or "Embraco"), a subsidiary of Whirlpool that operated under the name Embraco, S.A. until mid-2006, is a Brazilian corporation

8

headquartered in Joinville, Brazil. Embraco is Whirlpool's "Brazil-based compressor business" and has been affiliated with Whirlpool since the 1950s. It has been controlled by Whirlpool since 1997. Embraco, with an estimated 25 percent share of the global market for Hermetic Compressors, has extensive compressor production facilities in Brazil, Europe, and Asia. Embraco exports the Hermetic Compressors produced at its Brazilian factories to the United States. Hermetic Compressors manufactured by Embraco, as well as other Defendants, are included as components of various appliances sold by its parent Whirlpool under various brand names. During the Class Period, Embraco, directly and/or through its parent, Whirlpool, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

27.     Defendant Embraco North America, Inc. ("Embraco N.A.") is a Delaware corporation headquartered in Suwannee, Georgia. Embraco N.A. is a wholly-owned subsidiary of Embraco. Embraco N.A. is responsible for, among other things, "selling Embraco products in North America." During the Class Period, Embraco N.A., directly and/or through its parent companies Whirlpool and Embraco, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

### The Danfoss Entities

28.     Defendant Danfoss A/S ("Danfoss") is a Danish corporation headquartered in Nordborg, Denmark. Danfoss is one of the largest Hermetic Compressor manufacturers in Europe. Danfoss's Refrigeration and Air-Conditioning Division is responsible for manufacturing and selling the company's Hermetic Compressors and maintains extensive operations throughout the world, including sales and marketing subsidiaries in the United States. Danfoss's recent annual report states "the USA is now the [Refrigeration and Air-Conditioning] Division's largest

market," with 2007 sales of approximately $180 million. During the Class Period, Danfoss, directly and/or through its U.S. subsidiaries, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

29. Defendant Danfoss, Inc. ("Danfoss, Inc.") is a Delaware corporation headquartered in Baltimore, Maryland. Danfoss, Inc. is a wholly-owned subsidiary of Danfoss. Danfoss, Inc. is the primary sales and marketing arm of Danfoss in the United States, and serves as the headquarters for the U.S. operations of Danfoss's Refrigeration and Air-Conditioning Division. During the Class Period, Danfoss, Inc. directly and/or through its parent company and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

30. Defendant Danfoss Commercial Compressors, Ltd. ("Danfoss Compressors") is a Delaware corporation headquartered in Lawrenceville, Georgia. Danfoss Compressors is a wholly-owned subsidiary of Danfoss. During the Class Period, Danfoss Compressors, directly and/or through its parent company and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

31. Defendant Danfoss Compressor, LLC ("Danfoss Compressor LLC") is a Delaware limited-liability company headquartered in Arkadelphia, Arkansas. Danfoss Compressor LLC is a wholly-owned subsidiary of Danfoss. During the Class Period, Danfoss Compressor LLC, directly and/or through its parent company and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products throughout the United States, including Rhode Island.

32. Defendant Danfoss Scroll Technologies, LLC (f/k/a Scroll Technologies, LLC) ("Danfoss Scroll Technologies") is a Delaware limited-liability company headquartered in

Arkadelphia, Arkansas. During the Class Period, Danfoss Scroll Technologies was a wholly-owned subsidiary of Danfoss. Danfoss Scroll Technologies, directly and/or through its parent company and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

33.     Defendant Danfoss Turbocor Compressors, Inc. ("Danfoss Turbocor") is a Delaware corporation headquartered in Tallahassee, Florida. Danfoss Turbocor is a joint venture between Danfoss and Canadian engineering firm Turbocor, Inc., with each joint venturer owning a 50 percent stake. During the Class Period, Danfoss Turbocor, directly and/or through its parent company Danfoss and/or its U.S. affiliates, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

### The Panasonic Entities

34.     Defendant Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.) ("Panasonic"), is a Japanese corporation headquartered in Osaka, Japan. During the Class Period, Panasonic, directly and/or through its U.S. subsidiary Defendant Panasonic Corporation of North America, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

35.     Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation headquartered in Secaucus, New Jersey. Panasonic NA sells Hermetic Compressors in the United States through its Panasonic Industrial Company Division and is a wholly-owned subsidiary of Panasonic. During the Class Period, Panasonic NA, directly and/or through its parent company Panasonic, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

11

## The ACC Entities

36.     Defendant Appliances Components Companies, S.p.A. ("ACC"), is an Italian corporation headquartered in Pordeone, Italy. During the Class Period, ACC, directly and/or through its wholly-owned U.S. subsidiary, Defendant ACC USA, LLC ("ACC USA"), manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

37.     Defendant ACC USA is a Delaware limited-liability company headquartered in Madison, Alabama. ACC USA is "an ACC branch office" operating as a "sales, engineering and distribution center in the USA." In addition, "ACC USA provides the North American market with high quality hermetic compressors." During the Class Period, ACC USA, directly and/or through its parent company ACC, manufactured, marketed, and/or sold Hermetic Compressors for use in products sold throughout the United States, including Rhode Island.

## CO-CONSPIRATORS

38.     Various individuals, firms and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to name some or all of these persons as defendants.

39.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

40.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.  Each Defendant which is a subsidiary of a foreign parent acts as the sole United States agent for Hermetic Compressors made by its parent company.

## INTERSTATE TRADE AND COMMERCE

41.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce, in that Hermetic Compressors were sold to, and purchased by, both direct and end-payor purchasers in the United States.  The nature of the end goods for which Defendants manufactured Hermetic Compressors necessarily involved the distribution of the Defendants' Hermetic Compressors to every state in the United States and sales to purchasers in every state.  Defendants knew the nature of these markets and the uses for which their products were designed, and thus that they would receive the benefits of the laws of Rhode Island in facilitating the sales of the products. Defendants purposefully availed themselves of the benefits, protections and laws of Rhode Island.

42.     Thus, during the Class Period, Defendants and their co-conspirators issued and sold substantial quantities of Hermetic Compressors in a continuous and uninterrupted flow of interstate commerce, including in Rhode Island.

43.     In sum, the conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in Rhode Island.

## FACTUAL ALLEGATIONS

## The Hermetic Compressors Industry

44.     Hermetic Compressors are devices, sealed in a metal casing, that use a piston-like mechanism to compress refrigerant gases. When the compressed gas moves through the other components of the refrigerant system and is permitted to expand, it removes heat from its surroundings, producing a cooling effect that forms the basis for a variety of refrigeration applications.

45.     Hermetic Compressors are sold as stand-alone products, which are then installed as cooling components in other products such as refrigerators. Hermetic Compressors are also sold in the aftermarket as replacement parts.

46.     Hermetic Compressors constitute a large majority of all compressors and compressor units (except automotive open compressors) sold in the United States. Tecumseh, the amnesty applicant in the United States, European Union, and Brazil, manufactures and sells Hermetic Compressors. Danfoss was the leading seller of Hermetic Compressors in the United States during the Class Period.

47.     For the purposes of this Complaint, the relevant Hermetic Compressors have less than one horse power and are used in commercial and household refrigeration applications.

48.     The Hermetic Compressors industry is a multi-billion dollar industry. Total sales of the relevant Hermetic Compressors during the Class Period were in the billions of dollars.

49.     Hermetic Compressors were largely sold to OEMs which then incorporated them into consumer goods. These goods were resold to, among others, end-payor purchasers.

50.     Throughout the Class Period, OEMs purchased Hermetic Compressors from Defendants pursuant to contracts that determine the prices for the subsequent year.   Contract negotiations were held at different places around the world at the OEMs' choosing.

## THE CONSPIRACY

51.     In an effort to increase revenues, Defendants banded together to rig the bids made to OEMs prior to negotiations.

52.     In effectuating the conspiracy, the Defendants met secretly in order to conceal their bid rigging from the OEMs and the market.   Throughout the Class Period, Defendants regularly met to agree on the pricing of and market allocation strategies for Hermetic Compressors.

53.     These conspiratorial meetings often occurred directly before contract negotiations with the OEMs and, for obvious reasons, were not disclosed to the OEMs or the public.   During the course of these meetings, Defendants discussed general strategies in negotiating the coming years' contracts with the OEMs, and shared their proposed bids.

54.     In 2004 and 2005, for example, Defendants, including Tecumseh and Embraco, met in Europe prior to negotiations with the OEMs.   Defendants also engaged in telephone conversations to facilitate their bid rigging and market allocation scheme.

55.     In 2006, Defendants met again in Europe to discuss prices for Hermetic Compressors for 2007.

56.     Many of Defendants' top executives participated in these meetings.   A document from the Brazilian investigatory authority shows the following five executives, among others, were instrumental in furthering Defendants' conspiracy:

- Gerson Verissimo, the head of Defendant Tecumseh Brasil;
- Ernesto Henzelmann, CEO and President of Embraco;

- Valter Taranzano, CEO and President of ACC;
- Lars Snitkjaer, Director of Sales and Marketing for Danfoss; and
- Kaisha Masuda, Sales and Marketing Associate at Panasonic.

57.     In addition to fixing prices for Hermetic Compressors, Defendants also agreed to allocate market share.

58.     A further indication that Defendants were not vigorously competing against each other is the torpid manner in which they improved their products or responded to changing market conditions. According to an industry publication, "[c]ompared with air conditioning, the refrigeration industry has been slower with changes, both in terms of a shift towards scroll units, and also in terms of a shift towards efficiency and environmental protection."

## DEFENDANTS' PRICE-FIXING CONSPIRACY

59.     Defendants engaged in a wide-ranging conspiracy during the Class Period to raise, fix, maintain or stabilize the price of Compressors sold in the United States and elsewhere and engaged in anti-competitive practices in furtherance of their conspiracy.

60.     Increases in the prices for Compressors increased the prices for Refrigerant Compressor Products, even when the Refrigerant Compressor Products contained Compressors manufactured by the same or a related Defendant.  For example, when an Embraco Compressor was used in a refrigerator manufactured by Whirlpool, a "transfer price" was applied and incorporated into the final price of the refrigerator.

61.     The defendants carried out the conspiracy alleged herein through regular, secret meetings and communications throughout the entire Class Period, during which the prices of Compressors, as well as other market information relating to Compressors, were discussed and exchanged.  Such meetings and communications began as early as 2004, and possibly earlier.

62.     For example, in mid-March 2004, Gerson Verissimo, the managing director of Tecumseh Brasil, Jose Celso Lunardelli Furchi, who was responsible for Tecumseh Brasil's North American Compressor business, and Januário Domingos Soligon, also of Tecumseh, met with Ernesto Heinzelmann and Ingo Erhardt of Embraco, at Embraco's headquarters in Joinville, Brazil. At the time, Heinzelmann was responsible for the pricing of Embraco and Whirlpool S.A.'s Compressors sold in the United States.

63.     At this meeting, the attendees discussed, among other subjects, the Compressor markets throughout the world, including the United States. The attendees also discussed the need for price increases with respect to Compressors. Specifically, the meeting attendees discussed and reached an agreement to raise Compressor prices by 8-10% in June 2004 throughout the world, including in the United States. The pricing agreement reached during this meeting, and other discussions and meetings among the Defendants, generally involved a percentage increase in price that the Defendants would seek as well as an agreement on what they were likely to achieve. For example, some attendees would agree to tell customers that they were raising prices by 12% to 14%, while they were secretly agreeing with each other to settle for price increases of at least 8% to 10%. The meeting attendees also frequently discussed and agreed to refrain from taking each other's Compressor customers.

64.     Following this meeting, in or around May 2004, Gerson Verissimo of Tecumseh, made telephone calls to at least Valter Taranzano, President and CEO of ACC, and Lars Snitkjaer, Director of Compressors Sales and Marketing at Danfoss. Both Taranzano and Snitkjaer had pricing responsibility for Compressors sold in the U.S. for their respective companies. During these telephone conversations, Verissimo discussed with his co-conspirators the agreement to raise Compressor prices by 8-10%, and Taranzano and Snitkjaer agreed to raise

Compressor prices by 8-10% in June 2004 on behalf of their respective companies. Ernesto Heinzelmann of Embraco discussed the agreement with Masanobu Matsuda, who was responsible for the pricing of Compressors sold by Panasonic in the United States, and Matsuda also agreed to raise prices by 8-10% in June 2004 on behalf of Panasonic.

65.     In June 2004, the Defendants increased Compressor prices in the United States by 8-10%. Following the June 2004 price increase, there were numerous conversations among the Defendants to discuss their customers' reactions to the price increase, and to ensure that the Defendants were adhering to their agreement.

66.     Such meetings and communications continued throughout the entire Class Period and resulted in additional Compressor price increases. Such meetings and communications were bilateral and multilateral, occasionally involving all Defendants.

67.     For example, during the period of October 13-15, 2004, in connection with the International Trade Fair for Refrigerating and Air Conditioning ("IKK") being held in Nuremberg, Germany, representatives of the Defendants met secretly at a hotel in Nuremberg. They traveled to the meeting separately so as not to be seen together, and reserved a room at the hotel under a false name so as not to be detected. At least the following representatives of the Defendants attended the meeting: Valter Taranzano, Dino Turus, and Jordi Riu of ACC; Lars Snitkjaer and Jorn Westermann from Danfoss; Ernesto Heinzelmann, Gilberto Heinzelmann and Laércio Hardt of Embraco; Gerson Verissimo, Jean- Marc Sassier and Bartolomeo Genta from Tecumseh; and Masanobu Matsuda from Panasonic.

68.     The primary subject of this meeting was a Compressors price increase for 2005. Specifically, the meeting attendees discussed and agreed upon a 10% price increase to be

implemented in 2005. In addition to the discussion and agreement regarding price increases, the customers, capacity and production levels.

69.     In January 2005, the Defendants implemented Compressor price increases consistent with the agreement that had been reached at the October 2004 meeting in Nuremberg, Germany, including price increases in the United States.

70.     Further meetings occurred in September 2005, in order to agree upon Compressor pricing for 2006. In September 2005, there was a meeting among at least Gerson Verissimo of Tecumseh; Dailson Farias and Ernesto Heinzelmann of Embraco, and Paulo Frederico Meira de Oliveira Periquito of Whirlpool at Embraco's headquarters in Joinville, Brazil. Periquito was President and Chief Executive Officer of Embraco and Whirlpool S.A. during the Class Period and was also President of Whirlpool International, a division of Whirlpool Corporation. At this meeting, there was discussion about, among other things, the need for a multilateral meeting to discuss Compressor prices for 2006.

71.     Following the meeting in Joinville, later in September 2005, there was a meeting among at least Gilberto Heinzelmann and Laércio Hardt of Embraco; Lars Snitkjaer of Danfoss; Dino Turus of ACC; and Bartolomeo Genta and Michel Jorge Geraissate Filho of Tecumseh at the Frankfurt Airport in Frankfurt, Germany. The meeting attendees discussed Compressor prices for 2006 and agreed to maintain current prices and resist customers' efforts to obtain lower Compressor prices. Following this meeting, there were numerous telephone calls at least among Gerson Verissimo of Tecumseh; Laércio Hardt and Dailson Farias of Embraco; Valter Taranzano of ACC; and Lars Snitkjaer of Danfoss, and between representatives of Embraco and Panasonic, to discuss the agreement reached at the Frankfurt meeting, and to ensure that each of the defendants was adhering to the agreement.

72.     Throughout the entire Class Period, there were regular telephone communications between Defendants intended to implement and monitor the conspiracy. Further, representatives of the Defendants regularly attended trade association meetings, such as IKK, during October 18-20, 2006 in Nuremberg, Germany.

73.     One of the final meetings of the conspiracy occurred in July 2008, which representatives of the Defendants attended. The pricing of Compressors for the remainder of 2008 and for 2009 was discussed. Following this meeting, as described below, Defendant Tecumseh Products sought leniency from the DOJ and a worldwide investigation by various competition authorities into the Compressor market and these Defendants ensued.

### Structure and Characteristics of the Hermetic Compressors Market

74.     By its nature, the Hermetic Compressors market lends itself to price-fixing, thus making it easier for Defendants to engage in the misconduct alleged herein.

### Commodity-Like Products

75.     Within relevant categories, Hermetic Compressors are homogeneous, commodity-like products. For example, "Compressor Cross-Reference" guides, which demonstrate the substitutability of one Defendants' Hermetic Compressors for those of other Defendants, are available on the websites of numerous Defendants, including Defendants Danfoss and Tecumseh. The commodity-like nature of Hermetic Compressors is also exemplified by the significant aftermarket for replacement Hermetic Compressors in which most Defendants participate. Because Hermetic Compressors are commodity-like products, purchases are made largely, if not entirely, on price.

76.     Indeed, Tecumseh's own documents recognize that Hermetic Compressors were "highly commoditized."

77.    The Defendants were keenly aware of their products' geographic markets. They knew, for example, that a significant number of the Hermetic Compressors sold for use in products purchased by end-payors such as Plaintiff and members of the Class were sourced from production facilities located outside of the United States. Defendant Whirlpool acknowledged this fact in a 1997 submission to the Federal Trade Commission regarding the propriety of labeling refrigerators as being "Made in USA" despite containing Compressors produced outside the United States. In that submission Whirlpool stated that "the FTC should also know that the U.S. refrigerator industry MUST source a significant percentage of its compressors from abroad since there is insufficient domestic production of these parts" (emphasis in original). Whirlpool went on to argue that if the FTC implemented rules barring refrigerators containing foreign-sourced Compressors from being labeled as "Made in USA," "much of the U.S. refrigeration industry will be disqualified from making 'Made in USA' claims."

**Industry Concentration**

78.    During the Class Period, Defendants controlled the relevant Hermetic Compressors market, both globally and in the United States. High market concentration is another factor that is conducive to price-fixing.

79.    According to industry reports, Embraco holds approximately 40 percent of the R&F market, Panasonic approximately 35 percent, and Tecumseh controls approximately 20 percent. The remainder of the market is controlled by ACC and several others.

80.    Defendants as a group have held a stable and dominant position in the United States market throughout the Class Period. For instance, Tecumseh has identified the same five manufacturers, in addition to itself, as the major manufacturers of commercial and household

refrigeration compressors in its 10-K filing in every year since at least 1996, the beginning of the Class Period.

81.    Throughout the Class Period, Defendants dominated the United States market for relevant Hermetic Compressors, thus enabling them to raise prices above competitive levels.

**Barriers to Entry**

82.    There are substantial barriers to entry into the relevant Hermetic Compressors market. A new entrant into the industry would encounter significant hurdles, including multi-million dollar start up costs associated with manufacturing plants and equipment, distribution infrastructure, skilled labor and sales force, and significant variable costs associated with raw materials, energy, and shipping.

**Demand Inelasticity**

83.    Because there are no close substitutes for the relevant Hermetic Compressors, and because refrigeration is essential for many households and applications, demand for Compressors is highly inelastic. By allowing producers to raise prices without triggering customer substitution and lost sales revenue, inelastic demand facilitates collusion.

**Opportunity for Conspiratorial Communications**

84.    Defendants are members of several trade associations that provide opportunities to meet under the auspices of legitimate business.

85.    Defendants are members of Heating, Air-conditioning & Refrigeration Distributors International ("HARDI"), a trade organization for the heating, ventilating, air conditioning and refrigeration industry.

86.    A number of Defendants, including Danfoss, Embraco N.A., Panasonic NA, and Tecumseh, are members of the Air-Conditioning, Heating and Refrigeration Institute ("AHRI"),

22

an Arlington, Virginia-based trade association. The AHRI holds regular quarterly and annual meetings at locations throughout the United States. Such regularly scheduled trade association meetings provide the opportunity for participants in price-fixing conspiracies to meet, discuss and perform acts necessary for the operation and furtherance of the conspiracy under the guise of legitimate business contacts.

87.     Several Defendants, including ACC, Danfoss, Embraco, and Tecumseh, are also members of the Association of European Refrigeration Compressors and Control Manufacturers ("ASERCOM").

88.     In Brazil, Defendants belong to the Brazilian Association of Refrigeration, Air Conditioning, Ventilation and Heating ("ABRAVA").

89.     Throughout the Class Period, Defendants also participated IKK, a commercial trade show in Germany that is now called Chillventa.

90.     Additionally, during the Class Period, Defendants regularly exchanged sensitive pricing and market allocation information in person and by phone.

### Government Antitrust Investigations

91.     In February 2009, antitrust authorities in Brazil, the European Union, and the United States launched a coordinated international investigation into potential price fixing of Hermetic Compressors.

### Brazil

92.     On February 17, 2009, Brazilian antitrust and law enforcement authorities conducted a series of dawn raids on the offices of a number of Hermetic Compressor manufacturers, as well as the residences of current or former officers of at least two of the Defendant companies.

93.     Brazilian authorities publicly confirmed these raids were part of a coordinated international investigation involving European and United States antitrust regulators into a global cartel that had existed for at least the past 12 years.

94.     The Brazilian raids came as part of an investigation that began in late 2008, when one of the participants in the Hermetic Compressor conspiracy, Tecumseh, applied for leniency in three separate jurisdictions, effectively blowing the whistle on its co-conspirators.

95.     Statements issued by Brazilian authorities described the cartel's participants as having "agreed, through their managers, to fix price increases and also exchange commercially sensitive information," and regulators disclosed that the conspiracy operated through e-mail and telephone communications, as well as face-to-face meetings at hotels and restaurants, between the conspirators.  The report noted that Defendants had been exchanging confidential information for over 12 years.

96.     In a public filing on February 19, 2009, Defendant Whirlpool confirmed that its Brazilian subsidiary, Embraco, had been raided by Brazilian antitrust regulators.  Embraco settled with the Brazilian regulatory agency near the end of 2009 for approximately $57 million.

97.     Brazilian press reports state that, in addition to raiding Embraco's facilities, Brazilian antitrust and law enforcement authorities simultaneously raided the Sao Paulo apartment of Paulo F.M.O. Periquito – President of Whirlpool's Latin American operations from 1997 through 2007, and since 2007 the President of Whirlpool International – where investigators seized computers, laptops, and documents.

98.     The Brazilian press has reported that Brazilian antitrust and law-enforcement authorities raided the Sao Carlos home of Gerson Verissimo, who was President of Tecumseh Brasil until 2008.

99.     Tecumseh, which would later disclose that it had received amnesty from Brazilian authorities for admitting its role in the Hermetic Compressor cartel, confirmed in a statement on February 19, 2009 that it had received "a formal request for information from the Secretariat of Economic Law of the Ministry of Justice of Brazil" related to its investigation of the Compressor industry.

100.     Additionally, Whirlpool confirmed in a February 19, 2009 filing with the Securities and Exchange Commission ("SEC"), that its Brazilian subsidiary, Embraco, had been raided by Brazilian authorities; that its Italian subsidiary, the headquarters of the company's European operations, had been raided by the EC; and that the Antitrust Division of the DOJ had issued grand jury subpoenas and requests for "documents relating to an antitrust investigation of the global compressor industry."

101.     Upon information and belief, Panasonic's Brazilian operations, based in the Brazilian state of Sao Paulo, were also raided by Brazilian antitrust authorities as part of their investigation into the Hermetic Compressor cartel described herein.

**European Union**

102.     The dawn raids by Brazilian authorities were soon followed by surprise raids initiated by the European Commission in Denmark, Germany, Austria, and Italy.

103.     The European Commission issued a statement following the raids confirming the "Commission has reason to believe that the companies concerned may have violated EC Treaty rules on restrictive business practices [. . .] which prohibit practices such as price fixing and customer allocation."

104. Danfoss confirmed its headquarters in Nordborg, Denmark, as well as its primary Compressor manufacturing facility in Flensburg, Germany, were raided by the European Commission.

105. Whirlpool similarly confirmed its Italian subsidiary and the headquarters of the company's European operations were raided by the European Commission.

106. Upon information and belief, ACC's Italian headquarters and Austrian compressors factory were also raided by the European Commission.

### United States

107. On February 19, 2009, the U.S. Department of Justice confirmed that it was investigating "anti-competitive practices in the compressor industry" in cooperation with international antitrust authorities.

108. Whirlpool and Tecumseh confirmed they received grand jury subpoenas from the DOJ, and Tecumseh has stated the investigation was "related to a pricing issue."

109. Danfoss stated that "several of Danfoss's companies in the USA were visited by the American competition authority," noting that "the reason for the visits and the pending investigation is the suspicion of illegal pricing arrangements within the compressor market."

110. On February 27, 2009, Panasonic confirmed its U.S. subsidiary, Defendant Panasonic NA, "has been contacted by the U.S. government about an investigation relating to compressor pricing."

### Tecumseh's Amnesty Entry

111. On February 23, 2009, in a memorandum from President and CEO Ed Burker to all employees, Tecumseh admitted the cartel's existence. According to an internal memorandum of Tecumseh:

In mid-2008 we were made aware of certain activities that appeared to have occurred in prior years that did not appear to conform to our policies and standards of ethical conduct. Upon discovering these acts, the Company commenced an internal investigation led by independent outside counsel and directed by the Audit Committee of the Board of Directors. We also promptly brought the matter to the attention of authorities, and we have been cooperating with them in further information gathering. As a result of this action, <u>we entered into amnesty agreements in the U.S., Brazilian and European jurisdictions.</u> These agreements, which are conditioned on factors that include our continued cooperation with authorities, should protect the company from governmental fines and penalties that could result if the reported conduct is found to violate applicable law in such jurisdictions. (emphasis added).

112. To be granted amnesty from regulators in the U.S., Europe and Brazil, Tecumseh was required to admit its complicity in the conspiracy alleged herein, and to provide information to global competition authorities confirming the identities, roles and activities of its co-conspirators.

113. According to DOJ guidelines, a corporate amnesty applicant must "admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. A company that argues that an agreement to fix prices, rig bids, restrict capacity or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency. A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency."

114. Similarly, in order to be granted leniency by the European Commission – which can result in either total immunity from, or a reduction of, fines assessed for anti-competitive conduct – a company that participated in a cartel "must provide evidence that enables the Commission to prove the cartel infringement."

115. To be granted leniency from Brazil's Ministry of Justice, Secretariat of Economic Law, an applicant must furnish authorities with an "admission of participation in the anticompetitive practice" and offer a "complete description of the anticompetitive practice, including the identification of the other participants and the respective individual roles."

### Panasonic Corporation's and Embraco North America Inc.'s Guilty Pleas

116. On September 30, 2010, the U.S. Department of Justice filed separate one count felony charges against Panasonic Corporation and a Whirlpool Corporation subsidiary, Embraco North America Inc. in the U.S. District Court in Detroit, Michigan.

117. Both Panasonic and Embraco were charged with price fixing in violation of the Sherman Act, and plead guilty to their role in an international conspiracy to fix the prices of Refrigerant Compressors.

118. According the DOJ, Panasonic and Embraco participated in a conspiracy that took place from at least as early as October 14, 2004 until on or about December 31, 2007.

119. According to the charges, Panasonic, Embarco, and co-conspirators carried out the conspiracy by agreeing during meetings and conversations to coordinate prices of Refrigerant Compressors.

120. According to the charges, Panasonic, Embarco, and co-conspirators coordinated prices on household compressors, *i.e.*, compressors used for household, personal or family uses.

121. According to the charges, Embraco and co-conspirators also coordinated prices on light commercial compressors.

122. As part of the conspiracy, Panasonic, Embarco and co-conspirators exchanged information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

123. Panasonic agreed to pay $49.1 million in criminal fines.

124.    Embarco agreed to pay $91.8 million in criminal fines.

125.    According to the plea agreements, which are subject to court approval, both companies have agreed to cooperate with the DOJ's ongoing Refrigerant Compressor investigation.

## EFFECTS OF THE CONSPIRACY

126.    The market for Hermetic Compressors used in the commercial and household refrigeration market is inextricably linked with the market for commercial and household refrigeration products themselves. The relevant Hermetic Compressors exist to be incorporated into end products such as refrigerators and water coolers, without which the end products themselves would not function. Put simply, without the Hermetic Compressors that are installed, unaltered, these end products would be little more than storage boxes.

127.    Plaintiff and Class Members effectively participate in the market for Hermetic Compressors through their end-payor purchases of Hermetic Compressor Products. The Defendants' unlawful conspiracy has inflated the prices at which Plaintiff purchased Hermetic Compressor Products, and Plaintiff and the members of the Class as defined herein were injured thereby.

128.    To the extent Plaintiff and end-payor purchasers bought Hermetic Compressors as part of a refrigeration device or freezer, Defendants' unlawful conspiracy inflated the price at which OEMs resold the Hermetic Compressors as part of the products purchased by Plaintiff. In essence, Defendants have extinguished the market forces of competition to their mutual benefit and consumers, including Plaintiff, have been injured by paying supra-competitive prices for Hermetic Compressor Products.

129.    Thus, Defendants' unlawful actions have had at least the following effects:

(a)     Prices paid by Plaintiff and the members of the Class for Hermetic Compressor Products were fixed, stabilized, and/or maintained at supra-competitive levels in the United States and each of its states and territories;

(b)     Customers and markets for Hermetic Compressors were allocated among Defendants and their co-conspirators;

(c)     Plaintiff and the other members of the Class paid more for Hermetic Compressor Products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive activities;

(d)     Price competition regarding the sale of Hermetic Compressors was restrained, suppressed, and/or eliminated in the United States and each of its states and territories, thus raising the prices of Hermetic Compressor Products above the prices that would have been charged absent the Defendants' actions; and

(e)     As a direct and proximate result of the unlawful combination, contract or conspiracy alleged herein, Plaintiff and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

**FRAUDULENT CONCEALMENT**

130.    Plaintiff and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until February 18, 2009, when the global investigation was first publicly reported.

131. Because Defendants' agreements, understandings, and conspiracies were kept secret until February 18, 2009, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and did not know before that time that they were paying supra-competitive prices for Hermetic Compressor Products during the Class Period.

132. Defendants' acts in furtherance of the conspiracy were concealed and carried out in a manner that precluded detection.

133. Defendants' acts of concealment, which were effective in keeping the OEMs in the dark, were more than sufficient to preclude suspicion by end-payor purchasers. Accordingly, a reasonable person under the circumstances would not have been alerted to Defendants' conspiracy before February 18, 2009.

134. Because of the deceptive practices and techniques employed by Defendants and their co-conspirators to avoid detection, Plaintiff and the members of the Class could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

135. Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators, Plaintiff and the members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until February 18, 2009, when reports of the investigation into anti-competitive conduct concerning Hermetic Compressors were first publicly disseminated.

136. None of the facts or information available to Plaintiff and the members of the Class if investigated with reasonable diligence would have led to the discovery of the conspiracy alleged herein prior to February 18, 2009.

137. Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning Hermetic Compressors, which they affirmatively concealed, at least in the following respects:

(a) By meeting and communicating secretly to discuss prices and customers of Hermetic Compressors in the United States and throughout the world, including through e-mail and telephonic communications as well as at meetings at hotels and restaurants;

(b) By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their unlawful scheme; and

(c) By stating in public filings with the Securities and Exchange Commission, among other things, that: the compressors industry is "highly competitive"; and that compressor manufacturers "compete on the basis of product design, quality, availability, performance, customer service and price."

138. By reason of the foregoing, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and members of the Class have alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

139. Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased Hermetic compressors ("Hermetic Compressors") or products that contained Hermetic Compressors that were manufactured and/or sold by the Defendants, or any subsidiary, affiliate,

or co-conspirator thereof, at any time during the period from at least
January 1, 1996 through the present.

Specifically excluded from this Class are the Defendants; the officers,
directors or employees of any Defendant; any entity in which any
Defendant has a controlling interest; and any affiliate, legal representative,
heir or assign of any Defendant. Also excluded are any federal, state or
local government entities, and all persons or entities who purchased
Hermetic Compressors or Hermetic Compressor Products for resale.

140.    Plaintiff does not know the exact number of Class members. But due to the
nature of the trade and commerce involved, Plaintiff believes that there are thousands of Class
members.

141.    The Class is so numerous and geographically dispersed that joinder of all
members is impracticable.

142.    There are numerous questions of law and fact common to the Class, including:

  (a)    Whether Defendants and their co-conspirators engaged in a combination
         and conspiracy among themselves to fix, raise, maintain, or stabilize the
         prices of Hermetic Compressors sold in the United States and Rhode
         Island;

  (b)    Whether Defendants and their co-conspirators engaged in a combination
         and conspiracy among themselves to allocate customers or markets for
         Hermetic Compressors sold in the United States and Rhode Island;

  (c)    The identity of the participants of the alleged conspiracy;

  (d)    The duration of the alleged conspiracy and the acts carried out by
         Defendants and their co-conspirators in furtherance of the conspiracy;

  (e)    Whether the alleged conspiracy violated Rhode Island Law;

  (g)    Whether Defendants unjustly enriched themselves to the detriment of the

Class, thereby entitling Plaintiff and the other Class members to disgorgement of all benefits derived therefrom;

(h)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

(i)     The effect of the alleged conspiracy on the prices of Hermetic Compressor Products sold in Rhode Island during the Class Period;

(j)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and the other members of the Class; and

(k)     The appropriate Class-wide measure of damages.

143.    These common questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

144.    Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly-affected by Defendants' wrongful conduct in violation of the law of Rhode Island in that they paid artificially inflated prices for Hermetic Compressor Products purchased from Defendants or their co-conspirators. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

145.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

146. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

147. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## VIOLATIONS ALLEGED

### Count I – Violation of Rhode Island Law

148. Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this complaint.

149. From as early as January 1, 1996 through December 31, 2009, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Hermetic Compressors in unreasonable restraint of trade and commerce and in violation of R.I. Gen. Laws. § 6 13.1-1, *et seq.*

150. The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize and/or maintain at artificially supra-competitive prices for Hermetic Compressors, and to allocate customers for Hermetic Compressors in the United States.

151. In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a) participating in meetings and conversations among themselves during which they agreed to price Hermetic Compressors at certain levels, and otherwise to fix, increase, maintain, or stabilize effective prices paid by Plaintiff and members of the Class with respect to Hermetic Compressors sold in the United States;

(b) allocating customers and markets for Hermetic Compressors in the United States in furtherance of their agreements; and

(c) participating in meetings and conversations among themselves to implement, adhere to and police the agreements they reached.

152. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Hermetic Compressors.

153. Defendants' anticompetitive acts described above were knowing, willful and act of unfair competition and unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6 13.1-1, *et seq*.

154. Plaintiff and the Class members have been injured in their business and property by reason of Defendants' anticompetitive and/or unfair acts.

155. Plaintiff and members of the Class paid more for Hermetic Compressor Products than they otherwise would have paid absent the unlawful conduct alleged herein.

156. This injury is of the type that R.I. Gen. Laws. § 6 13.1-1, *et seq*. was designed to prevent, and was the direct and proximate result of Defendants' unlawful conduct.

36

Accordingly, Plaintiff and members of the Class seek all appropriate relief as provided for by R.I. Gen. Laws. § 6 13.1-1, *et seq.*, including but not limited to statutory damages, and actual damages (to be trebled or otherwise increased as permitted), injunctive relief, reasonable attorneys fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

## Count II – Unjust Enrichment

157.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

158.   By reason of their unlawful conduct, Defendants should make restitution to Plaintiff and the Class.

159.   Defendants have benefited from their unlawful acts through the overpayments for Hermetic Compressor Products by Plaintiff and the other members of the Class and the increased profits resulting from such overpayments.   It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by Defendants.

160.   Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiff and the other Class members may make claims on a *pro rata* basis for restitution.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(1)     That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that the Plaintiff be named the class representative and that Plaintiff's counsel be appointed as counsel for the Class;

(2)     That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed to be a violation of Rhode Island law as alleged in Count I;

(3)     That Defendants be found to have been unjustly enriched by their unlawful conduct as alleged in Count II and ordered to disgorge the profits each received as a result of their unlawful conduct;

(4)     That Plaintiff and the Class recover damages, as provided by Rhode Island law, and that a joint and several judgment be entered in favor of Plaintiff and the Class and against Defendants in an amount to be trebled or otherwise increased in accordance with such law;

(5)     That Plaintiff and the Class members recover damages and/or all other available monetary and equitable remedies available under Rhode Island law;

(6)     That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

(7)     That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

(8)     For such other and further relief as is just under the circumstances.

Respectfully submitted,

NAT GAFFET,

By his attorneys,

_____/s/_____

Christopher M. Lefebvre Esquire Bar # 4019
Claude Lefebvre, Christopher M. Lefebvre
P.C.
Two Dexter Street Pawtucket
BOX 479
Pawtucket, R.I. 02862
Tel. 401-728-6060
Fax 401-728-6534

-- and –

Charles E. Tompkins
Thomas G. Hoffman
Robert E. Ditzion
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109
Tel. 617-439-393-
Fax 617-439-0134
ctompkins @shulaw.com
thoffman@shulaw.com
rditzion@shulaw.com

*Counsel for Plaintiff Nat Gaffet and the Class*

Dated:  October 29, 2010